_Patrick M. Flatley_
Patrick M. Flatley
United States Bankruptcy Judge
**Dated: Friday, June 20, 2008 4:32:21 PM**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SUSAN KAY QUIGLEY | ) | Case No. 08-24 |
| | ) | |
| Debtor. | ) | Chapter 13 |

## MEMORANDUM OPINION

The two issues in this case concern the appropriate expense deductions for an above the median income debtor completing Form B22C, which implements the disposable income test of 11 U.S.C. § 1325(b). The two issues are whether: (A) the debtor may claim a secured debt expense deduction for collateral that the debtor intends to surrender, and (B) the debtor may claim a secured debt expense when the debtor is not using the secured collateral and a non-debtor party is actually making the secured debt payments.

The court will allow the expense deduction in both instances, but will require Form B22C to be amended to account for the additional income the debtor receives when her obligations are being paid by a non-debtor party.

## I. BACKGROUND

Susan Kay Quigley (the "Debtor") filed her Chapter 13 bankruptcy petition and schedules on January 11, 2008. She earns income above the median income level for her state of residence. On Schedule B, the schedule of her personal property, she lists two all terrain vehicles ("ATVs"). On Schedule D, the schedule of her secured debts, she states that both are security for notes executed by her. In the Debtor's proposed Chapter 13 plan, she states that she will surrender both ATVs to the secured creditors.

The Debtor also lists a 2004 Ford truck as her personal property on Schedule B. Below that

1

listing, is a notation that the truck belongs to her ex-boyfriend, however, the Debtor is listed on the vehicle's certificate of title as a legal owner. The boyfriend is making the payments on the vehicle to the secured lender, he is a co-debtor on the note, and he is in possession of the truck.

In filling out her Chapter 13 statement of current monthly income, calculation of commitment period, and calculation of disposable income (Form B22C), the Debtor included the debt payments owed on the two ATVs and the 2004 truck on Line 47. According to the Form, over each of the next 60 months, the Debtor owes $40.87 on one ATV, $122.46 on the other, and $307.83 on the 2004 truck in the possession of her ex-boyfriend. Based on the Debtor's calculations, she has no disposable income (negative $48.08) to pay to unsecured creditors in a Chapter 13 plan. If deductions for the ATVs and the truck are disallowed, then Form B22C would require that the Debtor pay her unsecured creditors $423.08 per month over the 60 month life of her Chapter 13 plan.     Currently, the Debtor's proposed Chapter 13 plan requires the Debtor to make bi-weekly payments to the Chapter 13 trustee of $122.77 over the next 60 months. Of that amount, the Debtor estimates that a total of $7,992 will be payable to her unsecured creditors (about $133 monthly), which will pay about 26% of their filed claims.

## II. DISCUSSION

The purpose of the disposable income test of 11 U.S.C. § 1325(b) is to determine how much a debtor will be required to pay to the debtor's unsecured creditors, calculated on a monthly basis, to obtain confirmation of a Chapter 13 plan when a party objects that the debtor is not committing all the debtor's disposable income to the plan for the repayment of the debtor's pre-petition, unsecured debts. Form B22C implements this test for Chapter 13 debtors. To reach the amount a debtor must pay to unsecured creditors, Form B22C allows certain deductions from the debtor's income for the debtor's existing secured debt expenses.

The Debtor's Chapter 13 trustee (the "Trustee"), and the United States Trustee (the "USTE"), both argue that the Debtor cannot claim a secured debt payment deduction on Form B22C for: (A) collateral the Debtor intends to surrender, and (B) the Trustee objects that the Debtor should not be allowed to deduct a secured debt expense on secured collateral not used by the Debtor and for which she does not

make the monthly secured debt payments.[1]

## A.      Deductions for Contractually Due Payments on Secured Collateral that the Debtor Intends to Surrender

In the view of the Trustee and the USTE, no secured debt deduction should be allowed on Form B22C when a debtor will not be making the secured debt payments post-petition.

Logically, this argument makes sense, and it is the result that the court would prefer to reach in this case.  But the court is not writing on a blank slate; its job is not to "'provide for what [it] might think . . . is the preferred result'"; rather, "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  In adjudicating this issue, the court will: (1) examine the applicable rules in the context of a Chapter 7 case, (2) determine whether those rules should be different in the context of a Chapter 13 case, and (3) consider whether the conclusion the court reaches is absurd.

### 1.      Secured Debt Deductions in Chapter 7: 11 U.S.C. § 707(b)(2)(A)(iii)(I).

When an above the median income Chapter 13 debtor is calculating the amount of disposable income that the debtor will have to commit to the repayment of the debtor's unsecured creditors, § 1325(b)(3) commands that the debtor's allowed expense deductions "be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)," which is applicable to Chapter 7 bankruptcy cases. Accordingly, to determine a Chapter 13 debtor's ability to claim a deduction for secured debt obligations on collateral that a debtor intends to surrender, the court must first determine how those obligations are to be treated within the context of a Chapter 7 case.

In a Chapter 7 case, § 707(b) requires a debtor to fill out a statement of current monthly income and means-test calculation.  Form B22A implements means testing in Chapter 7.  A debtor's allowable

─────────────────

[1] The United States Trustee originally objected to the Debtor's expense deduction for the secured debt payments on the 2004 Ford truck on the basis that the Debtor had no legal interest in the truck.  After filing the objection, however, the United States Trustee discovered that the Debtor did have a legal ownership interest in the truck, and, consequently, informed the court that the objection in that regard was moot.

3

expense deductions in the calculation are both actual and artificial.  The aim of the calculation is to determine "if the granting of relief" under Chapter 7 "would be an abuse of the provisions" of that Chapter. § 707(b)(1).  In ascertaining what expense deductions a debtor will be allowed regarding the debtor's secured debt obligations, the statute provides:

> (iii)    The debtor's average monthly payments on account of secured debts shall be calculated as the sum of –
>> (I)    the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition;
>
> . . .
>
> divided by 60.

§ 707(b)(2)(A)(iii)(I).

As this subsection is commonly understood, if a debtor has a secured, monthly car installment payment of $100, on which 48 monthly installment payments remain, then the "average monthly payment" used on the means test would be $80 (48 x $100 = $4,800 ÷ 60 = $80).

The Trustee and the USTE argue, however, that based on the language of the statute: (a) a secured debt is not "scheduled as contractually due" when a debtor intends to surrender collateral, and (b) by using the words "following the date of the petition," Congress prohibited a debtor from deducting those secured debt expenses that will not be incurred after filing bankruptcy.

### a.    "Scheduled as Contractually Due"

The primary case relied on by the Trustee and the USTE in arguing that a secured debt is not scheduled as contractually due when a debtor intends to surrender collateral is *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006).

In *Skaggs*, the court determined that the phrase "scheduled as contractually due" should be interpreted with reference to a Chapter 7 debtor's statement of intention.  *Id.* at 599-600.  Under this reasoning, the term "scheduled" is a term of art that refers to a debtor's bankruptcy schedules – and statements – required by 11 U.S.C. § 521(a)(1-2). "Scheduled" is not to be given its ordinary dictionary definition.  In support of this contention, the court in *Skaggs* noted that Congress also used the term "scheduled as" in § 1111(a) to refer specifically to the schedules required by § 521(a)(1).  Thus, the term

4

"scheduled as contractually due" required an examination of what the debtor's secured debts were as of the date of the petition, and what secured debts the debtor intended to pay in the future. *Id.* at 599. The *Skaggs* court believed that this interpretation best conformed to the Congressional intention behind the amendments to 11 U.S.C. § 707(b) wrought by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which was to require debtors that had the ability to repay their debts to do so. *Skaggs*, 349 B.R. at 600.

The legal analysis in *Skaggs*, however, is problematic – particularly its use of the word "scheduled" to refer to a review of a debtor's schedules and statements required by § 521(a)(1-2). A Chapter 7 debtor's "statement of intention" is not a "schedule." Also, the term "scheduled" is not a defined term of art in the Bankruptcy Code. As pointed out in the *Skaggs* decision, 349 B.R. at 599, the two words "scheduled as" are only used twice in the Code. The other use is in § 1111(a), which deems a proof of claim to be filed by a creditor if the debtor lists the creditor's claim on the schedules required by § 521(a)(1), unless the claim is "scheduled as disputed, contingent or unliquidated," in which case the creditor will be required to file a proof of claim by the applicable bar date. Thus, based on the context of § 1111(a), there is a definite connection between the term "scheduled as" and the schedules required by § 521(a)(1).

In contrast to "scheduled as," the word "scheduled," is used multiple times in the Bankruptcy Code[2] to refer either to the scheduling of a hearing, meeting, repayment schedule, or, to the schedules required by § 521. When the term "scheduled" means those schedules required by § 521(a)(1), that reference is generally clear from the context of the statute. *E.g.*, *In re Leary*, No. 07-31370, 2008 Bankr. LEXIS 1204 at *10-15 (Bankr. S.D. Tex. April 17, 2008) (stating that when the term "scheduled" refers to the schedules required by § 521(a)(1), there is usually a specific statutory cross reference); *In re*

---

[2] 11 U.S.C. §§ 363(c)(3) (scheduling of a hearing); 523(a)(3) (consequences of a debtor's failure to list a creditor on the schedules required by § 521(a)(1)); 523(a)(10) (debts that could have been scheduled, under § 521(a)(1), in a prior case); 524(k)(3)(H)(ii) (repayment schedule for reaffirmed debts); § 524(m)(1) (same); 554(c) (abandonment of property of the estate scheduled under § 521(a)(1)); 1103 (scheduled meeting of a committee); 1113(e) (scheduling of a hearing); 1114(h)(2) (same); 1116(2) (scheduling of a meetings); 1308(a), (b) (filing of tax return before a scheduled meeting of creditors); 1326(a)(1)(B) (making payments scheduled in a lease of personal property).

*Makres*, 380 B.R. 30, 35 (Bankr. N.D. Okla. 2007) ("scheduled" is defined by context).  In the context of § 707(b)(2)(A)(iii)(I), no indication exists that the term "scheduled as" refers to the schedules required by § 521(a)(1).  *E.g.*, *In re Sorrrell*, 359 B.R. 167, 185 (Bankr. S.D. Ohio 2007) ("In the context of § 707(b)(2)(A)(iii), the words "scheduled as" are used in a completely different context and, unlike § 1111(a), do not refer to the bankruptcy schedules."); *In re Nockerts*, 357 B.R. 497, 502 (Bankr. E.D. Wisc. 2006) (same).

Moreover, unlike § 1111(a), which specifically references the content of the schedules required by § 521(a)(1), no official bankruptcy schedule exits that list debts that are contractually due to secured creditors after the filing of the bankruptcy petition.  *E.g.*, *Fokkena v. Hartwick*, 373 B.R. 645, 654 (N.D. Ill. 2007) ("[T]here is no bankruptcy schedule that requires a debtor to list 'all amounts contractually due to secured creditors . . . .'").  Schedule D lists a debtor's secured creditors, but that schedule only includes entities holding claims secured by property of the debtor as of the filing of the bankruptcy petition.  A debtor's obligation on the claims held by Schedule D creditors may not be "contractually due" post-petition.  *See, e.g.*, *In re Ballard*, No. 07-61486, 2008 Bankr. LEXIS 882 at *13-14 (Bankr. March 25, 2008) (holding that no amount is contractually due on a claim secured by a judgment lien because the contract has merged into the judgment); *In re Anderson*, 383 B.R. 699, 707 (Bankr. S.D. Ohio 2008) ("This court construes the term 'contractually due' as modifying 'secured debt' to differentiate between voluntarily secured debts such as mortgages and security agreements and involuntarily secured debts such as judgment liens and statutory liens.").

Therefore, in this court's view, it is not appropriate to interpret the term "scheduled as" in § 707(b)(2)(A)(iii)(I) as making reference to a debtor's schedules and statements required to be filed by § 521(a)(1-2) because: (1) a statement of intention (or a Chapter 13 plan) is not a schedule; (2)  the context of the statute does not indicate any reference to the schedules and statements required by § 521(a)(1-2); and (3) no bankruptcy schedule exists that lists secured debts that are contractually due post-petition.

The other viewpoint, that the term "scheduled" should be given its ordinary dictionary definition, is exemplified in the case of *In re Walker*, No. 05-15010, 2006 Bankr. LEXIS 845 (Bankr. N.D. Ga. May 1, 2006).  There, the court looked to Webster's Dictionary to interpret the word "scheduled" as "to plan for a certain date."  *Id.* at *9.  In context, the phrase "scheduled as contractually due" meant "those

payments that the debtor will be required to make on certain dates in the future under the contract." *Id.* This is a natural reading. *E.g.*, *Stapleton v. Mundy (In re Mundy)*, 363 B.R. 407, 412-13 (Bankr. M.D. Pa. 2007) ("To interpret the common verb 'scheduled' as a reference to the proper noun 'Schedule' as used in the Bankruptcy Code is a grammatical exercise too complex and strenuous to be considered 'plain.'"); *In re Sorrell*, 359 B.R. 167 (Bankr. S.D. Ohio 2007) ("[T]he words 'scheduled as' . . . . do not refer to the bankruptcy schedules."); *In re Randle*, 358 B.R. 360, 366 (Bankr. N.D. Ill. 2006) ("[T]he context of this provision . . . clearly requires the debtor to list payments 'scheduled' under secured debt instruments, virtually all of which call for installment payments that are scheduled to be paid on a monthly basis."), *aff'd*, No. 07-C-631, 2008 U.S. Dist LEXIS 54985 (N.D. Ill. July 20, 2007).

Furthermore, with regard to the surrender of property and § 707(b)(2)(A)(iii)(I)'s requirement that a debt be "contractually due," the act of surrendering property does not change the debtor's obligation to make payments under the pre-petition contract. *E.g.*, *In re Hayes*, 376 B.R. 55, 62 (Bankr. D. Mass. 2007) ("Nor does declaring an intention to ultimately surrender property to the creditor abrogate a debtor's contractual obligations."). The entry of a discharge in a bankruptcy case only makes the pre-petition contractual obligation unenforceable as a personal liability of the debtor; the underlying debt is not extinguished and it continues to exist. *E.g.*, 11 U.S.C. § 524(a)(2) (stating that a discharge "operates as an injunction against the commencement or continuation of . . . an act, to collect . . . such debt as a personal liability of the debtor . . . ."); *Puller v. Credit Collections USA, Inc. (In re Puller)*, No. 05-1881, 2007 Bankr. LEXIS 2017 at *7 (Bankr. N.D.W. Va. June 20, 2007) ("A debt is not extinguished by the discharge injunction; rather, it is merely uncollectible as a personal liability of the debtor."); *United States v. Alfano*, 34 F. Supp. 2d 827, 841 (E.D.N.Y. 1999) ("Part of the conceptual difficulty may arise from the interplay between a discharge of the debtor's debt and an extinguishment of the creditor's claim. The key point is that although a debtor's debt may be personally discharged in bankruptcy, the underlying debt is not extinguished."). Even though discharged, nothing prevents a debtor – at any time – from voluntarily making payments to the creditor holding an unenforceable contractual obligation. 11 U.S.C. § 524(f) ("Nothing . . . prevents a debtor from voluntarily repaying any [discharged] debt."). Payments under § 524(f) are not gifts, they are the "repayment" of unenforceable obligations. Thus, even if a debtor surrenders collateral and receives a discharge, the debt is still "contractually due."

In sum, taken in its proper context, the term "scheduled as contractually due" means those secured debt obligations incurred by the debtor pre-petition, for which installment payments are scheduled to be due post-petition under the applicable debt instrument.

### b.   "Following the Date of the Petition"

The USTE asserts that the language of § 707(b)(2)(A)(iii)(I) requires the court to look into the future to determine what debts are "scheduled as contractually due to secured creditors in each month of the 60 months *following the date of the petition*." (emphasis added).  When a debtor surrenders secured collateral, the USTE argues, no secured debt payments will be made "following the date of the petition." In the USTE's view, § 707(b)(2)(A)(iii)(I) should not be interpreted based on past events.

The USTE's interpretation, however, is not warranted by the language of the statute.  Ascertaining what payments are due "following the date of the petition" must be determined with reference to those debts that are "scheduled as contractually due."  *In re Hayes*, 376 B.R. at 64 ("Nothing in the phrase 'following the date of the petition' suggests that the calculation must include only those payments actually made. Instead, the phrase modifies the preceding portion of the statute which refers to those payments that are 'scheduled as contractually due.'").  Nothing in § 707(b)(2)(A)(iii)(I) references a debtor's potential surrender of collateral post-petition. *E.g.*, *In re Rudler*, __ B.R. __, 2008 Bankr. LEXIS 1599 at *11 (B.A.P. 1st Cir. 2008) ("[A] 'snap shot' of the debtor's situation as of the petition date is a more appropriate approach. . . . If Congress intended otherwise, it could easily have said that the only deductible payments are those that the debtor intends to reaffirm.");  *Randle v. Neary, (In re Randle)*, No. 07-C-631, 2007 U.S.Dist. LEXIS 54985 at *20 (N.D. Ill. July 20, 2007) (noting "the complete absence of any conditions placed on the relevant language . . . with regard to whether the debtor intends to redeem, reaffirm, or surrender the collateral underlying the secured debt.");  *Sorrell*, 359 B.R. at 186 ("Section 707(b)(2)(A)(iii)(I) does not reference any post-petition eventuality . . . to adjust that calculation, including an intention to surrender secured property.").

Furthermore, interpreting § 707(b)(2)(A)(iii)(I) as providing for a "snapshot" of a debtor's liabilities as of the petition date is consistent with the preceding subparagraph, § 707(b)(2)(A)(ii)(I), which states that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National and Local Standards . . . as in effect on the date of the order for relief." *E.g.*, *Nockerts*,

8

357 B.R. at 501 (stating that, regardless of the tests employed pre-BAPCPA that took into account a debtor's change in circumstances following the petition date, BAPCPA's abuse test in § 707(b)(2) only looks to the petition date). Using a "snapshot" of the debtor's financial circumstances as of the petition date is also consistent with Congress's goal to limit judicial discretion in determining if abuse is present in a Chapter 7 case. *E.g.*, *Sorrell*, 359 B.R. at 184 ("[T]he overall means test of § 707(b)(2) is a formulaic attempt by Congress to establish the calculations used to determine a presumption of abuse with a minimum, if any, exercise of discretion."); Hon. Keith M. Lundin, *Ten Principles of BAPCPA: Not What Was Advertised*, 24-7 A.B.I.J. 1, 69 (Sept. 2005) ("BAPCPA is packed with provisions intended to 'reduce the discretion' of bankruptcy judges. The self-proclaimed backbone of BAPCPA – the abuse test in § 707(b) – purports to be a mindless mathematical formula with fill-in-the-blank numbers and presumptions.").

Accordingly, the court rejects the USTE's argument that the words "following the date of the petition" in § 707(b)(2)(A)(iii)(I) requires the court to consider the debtor's intention to surrender collateral because: (1) that phrase plainly references those debts that were "scheduled as contractually due," i.e., those debts that were in existence before the filing of the bankruptcy petition for which the contractual payments are due post-petition; (2) to be consistent with the preceding subparagraph, § 707(b)(2)(A)(ii)(I), the debts scheduled as contractually due should be determined as of the petition date, and (3) interpreting § 707(b)(2)(A)(iii)(I) as of the petition date is consonant with the mechanical application of the means test intended by Congress, and while the means test may not function perfectly, the court cannot tamper with the language of the statute to obtain a particular result.

Therefore, the court concludes that § 707(b)(2)(A)(iii)(I) allows a Chapter 7 debtor to take a secured debt deduction for collateral that the Chapter 7 debtor intends to surrender for the following reasons: (1) the word "scheduled" should be given its ordinary dictionary definition, and in the context of § 707(b)(2)(A)(iii)(I), it means those payments that the debtor will be required to make on certain dates in the future under the pre-petition contract; (2) even if collateral is surrendered and the debtor receives a discharge, the underlying secured debt is not extinguished: it is still "contractually due"; (3) § 707(b)(2)(A)(iii)(I) is a snapshot of the debtor's financial circumstances as of the date of the filing of the petition, and no language instructs, much less suggests, that the court can take an anticipated future

surrender of the collateral into consideration; and (4) the implementation of a mechanical test for determining secured debt deductions conforms to the intent of Congress to bring uniformity in the application of Chapter 7 abuse testing by the courts, and the mechanical test chosen by Congress implements its goal (however anomalously) of ensuring that debtor who can pay, do pay.

### 2.    Adoption of § 707(b)(2)(A)(iii)(I) in Chapter 13 Cases

Concluding that a Chapter 7 debtor may deduct secured debt obligations on collateral that the Chapter 7 debtor intends to surrender does not end the analysis in this case. The court must next consider whether anything in § 1325(b)(3)'s adoption of the expense deductions listed in § 707(b)(2)(A) requires a different result in this case.

While a simple syllogism would suggest that the result compelled by § 707(b)(2)(A)(iii)(I) should be the same in both Chapters 7 and 13, several courts have concluded otherwise. *See, e.g.*, *In re Van Bodegom Smith*, 383 B.R. 441, 450 (Bankr. E.D. Wisc. 2008) ("Ordinarily one would think that if 'scheduled as contractually due' means 'due under the contract' in a Chapter 7 context, it should mean exactly the same in any other context in which it appears[, but it does not in the context of Chapter 13].''); *In re McPherson*, 350 B.R. 38, 46 (Bankr. E.D. Va. 2006) (holding that "[t]he term 'contractually due' . . . does not carry the same meaning in a Chapter 13 case as in a Chapter 7 case."); *In re Crittendon*, No. 06-10322, 2006 Bankr. LEXIS 2172 at * 8 (Bankr. M.D.N.C. Sept. 1, 2006) (noting that the debtor's argument to allow the deduction may be correct in a Chapter 7 case, but disallowing the deduction in the context of a Chapter 13 case).

To understand how these courts have reached this conclusion, an examination of how the means test deduction in 11 U.S.C. § 707(b)(2)(A)(iii)(I) is made applicable to Chapter 13 debtors is necessary.

Section 1325(b)(1) of the Bankruptcy Code[3] provides that, on objection of the trustee or the

---

[3] The statute provides:
(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–

. . .

holder of an allowed unsecured claim, the court "may not approve the plan unless, as of the effective date of the plan . . . the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan." § 1325(b)(1)(B).   In turn, a debtor's "disposable income" means the "current monthly income received by the debtor . . . less amounts reasonably necessary to be expended – (A)(i) for the maintenance or support of the debtor . . . ."  § 1325(b)(2)(A)(i).  When the debtor earns income above the median income level of the debtor's applicable state, then the "amounts reasonably necessary to be expended" under the disposable income test "shall be determined in accordance with subparagraphs (A) and (B) of

---

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended–

   (A)      (i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed;

. . .

(3) Amounts reasonably necessary to be expended under paragraph (2) . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than [the median family income]

. . .

(4) For purposes of this subsection, the "applicable commitment period"--

   (A) subject to subparagraph (B), shall be--

. . .

      (ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than [the median family income] . . . .

11 U.S.C. § 1325(b).

11

section 707(b)(2)." § 1325(b)(3).

Based on this statutory scheme for determining a Chapter 13 debtor's disposable income, courts have articulated at least seven reasons why the Chapter 7 application of § 707(b)(2)(A)(iii)(I) should be different in the context of a Chapter 13 case: (a) confirmation of a plan is a "new contract" and amounts "contractually due" are determined with respect to confirmation of the plan and not with reference to the debtor's pre-petition contracts; (b) determining deductions "in accordance with" § 707(b)(2) only requires that § 707(b)(2)(A)(iii)(I) be a guiding standard, not an absolute substitute for a Chapter 13 debtor's expenses; (c) the term "projected disposable income to be received" is different from the defined term "disposable income," and it requires a forward looking approach in determining a debtor's disposable income; (d) the disposable income determination in Chapter 13 is to take place "as of the effective date of the plan" – not as of the petition date; (e) only those amounts "reasonably necessary to be expended" may be deducted in determining a debtor's disposable income; (f) expense deductions taken by a debtor are only those that "first become payable after the date the petition is filed"; and (g) the purpose for which the § 707(b)(2)(A)(iii)(I) test is employed in Chapter 7 is different from the purpose of the disposable income test in Chapter 13, which justifies a different result in the context of a Chapter 13 case.  The court will consider each reason in turn.

### a.    New Contract

In the view of some courts, confirmation of a plan, or the absence of a timely objection to confirmation of a plan, results in a "new contract" such that the language of § 707(b)(2)(A)(iii)(I), allowing a deduction for those debts that are "scheduled as contractually due to secured creditors" refers to the debts listed to be paid in the debtor's Chapter 13 plan – not to the debtor's pre-petition obligations.  *E.g.*, *Van Bodegom Smith*, 383 B.R. at 453 ("[B]ecause there are no mortgage payments 'scheduled as contractually due' under the new arrangement, the debtors cannot deduct those mortgage payments from their current monthly income in the disposable income calculation."); *In re Coleman*, 382 B.R. 759, 764 (Bankr. E.D. Ark. 2008) ("[T]he plan becomes the new contract between the debtor and his creditors. If the debtor proposed to surrender the collateral in his proposed plan, payment will no longer be made on the particular debt, and there would be 'no amounts scheduled as contractually due' in the future based on the contract.'"); *McPherson*, 350 B.R. at 47 (same).

12

While explaining that a confirmed plan is akin to a "new contract" is a useful analogy in relating a complex legal event to a layperson, a confirmation order is in no way a new contract between a debtor and the debtor's creditors.

By way of illustration, 11 U.S.C. § 1327(a) explicitly states that "the provisions of a confirmed plan bind the debtor and each creditor . . . whether or not such creditor has objected to, has accepted or has rejected the plan." In fact, the term "cramdown" is used in Chapter 13 to refer to a debtor's right to enforce the terms of a Chapter 13 plan over a creditor's objection. *Till v. SCS Credit Corp.*, 541 U.S. 465, 468 (2004). Forcing a creditor to deal with a debtor over the creditor's objection simply is not compatible with the law of contract. *E.g.*, *Restatement (Second) Contracts* § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

Also, confirmation of a plan is not akin to a substituted contract. In contract law, a "substituted contract" is defined as "(1) . . . a contract that is itself accepted by the obligee in satisfaction of the obligor' existing duty." *Id.* at § 279. When parties execute a "substituted contract" the duties of the original contract are discharged, and no further action can be taken on the original contract even if the substituted contract is breached. *Id.* In contrast, when a debtor breaches the terms of a confirmed plan, the bankruptcy case is likely to be dismissed, and in such a case it is the original obligation that remains in effect – not as modified under the order of confirmation. *E.g.*, 11 U.S.C. § 349(b); 3 *Collier on Bankruptcy* ¶ 349.03[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("The objective of section 349(b) is to restore all property rights, as far as practicable, to the positions they occupied at the commencement of a case that was dismissed under one of the operative sections of title 11.").

Even the labels are not comparable. Amounts "contractually due" to a secured creditor is different than amounts due a secured creditor pursuant to a court order (i.e., a confirmed plan). In short, an order of confirmation is just that – a judicially imposed order entitled to the effects of res judicata, the breach of which is punishable by contempt – it is not a contract.

### b.    Claiming Deductions "In Accordance With" § 707(b)(2)(A)

Another basis used by courts to forbid a Chapter 13 debtor from claiming a secured debt deduction on Form B22C for collateral the debtor intends to surrender is the language of § 1325(b)(3),

13

which provides that the expense portion of the disposable income test for an above the median income debtor "shall be determined *in accordance with* subparagraphs (A) and (B) of section 707(b)(2)." (emphasis added).  As explained by the court in the case of *In re Long*, No. 07-10728, 2008 Bankr. LEXIS 1289 at *17 (Bankr. E.D. Tex. April 25, 2008), this language means "that a court is not permitted to violate those given standards in making its determination. [The statute] establishes parameters for that determination and supplants a court's determination only if the given standard is violated."  Thus, *Long* concluded that in the context of a Chapter 13 case, § 1325(b)(3) does not mandate the allowance of the same type of expenditures that a debtor could claim in a Chapter 7 case. *Id.* at *20.

Leaving aside – for the moment – the debate over whether the means test employs standards or rules and why that distinction is important, *Long's* interpretation of the phrase "in accordance with" to impose a cap on a Chapter 13 debtor's actual expenditures is not supported by the meaning of the word "accordance."  The word "accordance" which is not a legal term, is defined by *Webster's Ninth New Collegiate Dictionary*, 50 (1991) to mean "AGREEMENT, CONFORMITY <in ~ with a rule>."  Accordingly, when § 1325(b)(3) requires the court to calculate the expense portion of the disposable income test for an above the median income debtor "in accordance with subparagraphs (A) and (B) of section 707(b)(2)," there must be an agreement or conformity between the expense deductions allowed in a Chapter 7 case to those allowed under § 1325(b)(3).  Reading the language of § 1325(b)(3) as imposing any other instruction or requirement is unwarranted.  *E.g.*, *In re Anderson*, 383 B.R. 699, 707 (Bankr. S.D. Ohio 2008) ("[I]n the case of the secured debt expense of § 707(b)(2)(A)(iii), the court finds no principled basis to interpret the statutory language differently for Chapter 13.").

Thus, if § 707(b)(2)(A)(iii)(I) imposes a rule and not a standard (which this court believes it does), then calculating a Chapter 13 debtor's expenses "in accordance with" that rule does not authorize a court to transmogrify the rule into a standard subject to judicial discretion.  Applying the rule one way in Chapter 7, and a different way in Chapter 13, means that the applications, and the results of the applications, are not "in accordance."

A second basis for determining that the phrase "in accordance with" imposes a cap on a Chapter 13 debtor's secured debt expenses is found in the case of *In re McGillis*, 370 B.R. 720, 730  (Bankr. W.D. Mich. 2007).  There, the court compared §§ 1325(b)(2) and (b)(3), both of which use the phrase

14

"in accordance with," and determined that the meaning given to the phrase in § 1325(b)(2) should also be applied in § 1325(b)(3).[4]  As explained by the court, expenses claimed by the debtor under § 1325(b)(3) should be limited based on "reasonably necessary" standard:

> "In accordance," though, simply means in agreement or in conformance. Indeed, Congress used the same phrase in BAPCPA to amend immediately preceding Section 1325(b)(2) when it excepted from current monthly income support payments received for a dependent child "made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for each child. . . ."  It is unlikely that anyone would suggest that "in accordance" as used in that subsection means that the applicable bankruptcy laws ordering the support are to override the bankruptcy court's independent consideration of whether the expenditure of the same is required. Otherwise, the additional reference to the reasonable necessity of the payments in that clause would be superfluous. Instead, the phrases "applicable nonbankruptcy laws" and "to the extent reasonably necessary to be extended" must be interpreted as being conjoined by "in accordance with" so as to complement each other. . . .

> Similarly, Section 1325(b)(3) should not be interpreted as categorically substituting the Section 707(b)(2) expense restrictions for the "reasonably necessary" expense requirement already imposed by Section 1325(b)(2). Rather, it should be interpreted as offering a further guideline for ensuring that the expenses claimed by an above-median-income debtor are reasonably necessary.

*McGillis*, 370 B.R. at 729-30.

The problem with this interpretation was ably identified in *Van Bodegom Smith*, 383 B.R. at 448. Chiefly, the phrase "in accordance with" appears in different contexts in §§ 1325(b)(2) and (b)(3).  *Id.* In § 1325(b)(2), the phrase is statutorily linked by the phrase "to the extent reasonably necessary," which

---

[4] Compare:

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made *in accordance with* applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended--

(A) (i) for the maintenance or support of the debtor . . . .

(3) Amounts reasonably necessary to be expended under paragraph (2) . . . shall be determined *in accordance with* subparagraphs (A) and (B) of section 707(b)(2).

11 U.S.C. § 1325(b)(2-3) (emphasis added).

specifically allows the bankruptcy court to exercise discretion over what is reasonable in a given case. *Id.* In contrast, "§ 1325(b)(3) states that the amounts determined to be reasonably necessary under § 1325(b)(2) *shall* be determined in accordance with § 707(2)(2)(B) and (A) – period." *Id.* Unlike § 1325(b)(2), no limiting language exists in § 1325(b)(3).

### c.     "Projected Disposable Income to be Received"

Some courts reason that § 1325(b)(1)'s use of the phrase "projected disposable income to be received" means that a debtor's expenses are to be determined under a forward looking approach, which means that the expenses of a debtor as of the date of confirmation may be different that the debtor's expenses as of the date the bankruptcy petition was filed. *E.g., Van Bodegom Smith*, 383 B.R. at 454 ("The phrase 'to be received,' like the word 'projected' is forward looking. It refers to projected disposable income that the debtor will receive in the future."); *In re Love*, 350 B.R. 611, 613 (Bankr. M.D. Ala. 2006) ("One would not project or anticipate that a payment would be made on a secured indebtedness where the collateral has been returned.").

The problem with this argument is that the term "disposable income" is specifically defined. As stated in § 1325(b)(2), "disposable income" is the debtor's "current monthly income" less amounts reasonably necessary to be expended – (A)(i) for the maintenance and support of the debtor . . . ." In turn, § 1325(b)(3) dictates that "amounts reasonably necessary to be expended" is to be "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if [the debtor has income above the applicable State's median income]."

As stated by this court in the case of *In re Simms*, No. 06-1206, 2008 Bankr. LEXIS 224 at *21-27 (Bankr. N.D.W. Va. Jan. 23, 2008), the word "projected" modifies the defined phrase "disposable income," and does not itself create a separate definition. Moreover, the phrase "projected disposable income to be received" is not new, and, pre-BAPCPA, was generally understood to required a determination of a debtor's income and expenses as of the petition date, projected forward over the life of the plan. *Id.* at *22-24 (citing cases). The court also determined that Congress eroded the pre-BAPCPA practice of adjusting the debtor's income and expenses up or down based on the happenings of post-petition events by importing the Chapter 7 means test expenses into Chapter 13. *Id.* at *26 ("Congress has spoken sufficiently clear that the old rules employed by the bankruptcy court for

16

determining disposable income are no longer adequate, and the new statutory formula of §§ 1325(b)(2) and 101(10A) are meant to replace – rather than supplement – the bankruptcy court's pre-BAPCPA discretionary practice of adjusting the Schedule I & J numbers to conform with the bankruptcy court believes is a more accurate portrayal of a debtor's ability to pay."); *In re Buck*, No. 07-31513, 2007 Bankr. LEXIS 4272 at \*8 (Bankr. E.D. Va. Dec. 14, 2007) ("In view of the detailed changes Congress made to the definition of 'disposable income,' coupled with the historical application of the unaltered term 'projected,' this Court can only conclude that Congress intended for the amount derived from application of the newly defined term 'disposable income' to be projected out over the applicable commitment period.").

Even if the court could interpret the term "projected" to allow it to consider post-petition changes in income, §§ 1325(b)(3) and 707(b)(2)(A)(iii)(I) concern the expense side of the disposable income equation and neither subparagraph qualifies expenses with the term "projected." *In re Allen*, No. 07-41327, 2008 Bankr. LEXIS 364 at \*20 n.31 (Bankr. D. Kan. Feb. 15, 2008) ("When looking at the statutory language on the expense side of the means test equation, however, § 707(b)(2)(A)(iii)(I) does not require (or allow) the Court to look to the 'projected' amounts due to secured creditors in the future . . . .").

Consequently, this court has already rejected the notion that the term "projected disposable income to be received in the applicable commitment period" for an above the median income debtor requires the court to consider what expenses a debtor will or will not have in the future. To allow a debtor's actual, or future, income and expenses to govern the analysis would render § 1325(b)(3) supererogatory. *E.g.*, *In re Turner*, 384 B.R. 537, 544 (Bankr. S.D. Ind. March 27, 2008) ("The addition of § 1325(b)(3) effectively eliminated that discretion with respect to above the median income debtors and to hold otherwise by using the means test as a mere starting point would essentially render § 1325(b)(3) meaningless.").

### d.    "As of the Effective Date of the Plan"

Some courts have determined that, in the context of a Chapter 13 case, the disposable income determination is to be made "as of the effective date of the plan," and, therefore, debts that are not being paid as part of the plan cannot be deducted on Form B22C. As explained by one court:

The "as of the effective date of the plan" language as used in section 1325(b)(1) is

17

followed by both subparagraph (A) and subparagraph (B) of section 1325(b)(1). Given this arrangement of the statutory language, the plain meaning of the statute is that both subparagraph (A) and subparagraph (B) are modified by the "as of the effective date of the plan" language in section 1325(b)(1) and such language therefore is applicable to both subparagraphs. This means that the determination called for under section 1325(b)(2)(B) depends upon whether as of the effective date of the plan the plan commits all of the debtor's projected disposable income to make payments to unsecured creditors. In order to make this determination, the court must determine the "disposable income" of the debtor as of the effective date of the plan which generally is regarded as the date of confirmation. Accordingly, "disposable income" will be determined in this case by applying section 707(b)(2)(A) and (B) according to the pertinent circumstances existing on the date of the confirmation hearing, rather than on the basis of the circumstances existing on the petition date.

*In re Crittendon*, No. 06-10322, 2006 Bankr. LEXIS 2172 at *9-10 (Bankr. M.D.N.C. Sept. 1, 2006).

While this court respects and understands the reasoning of *Crittendon*, and similar cases, the court disagrees with the conclusion that phrase "as of the effective date of the plan" requires a determination of expenses at or after the date of confirmation.[5]

Importantly, § 1325(b)(3) directs that the expenses for an above the median income Chapter 13 debtor "shall be determined in accordance with" § 707(b)(2). As stated *supra*, Part A(1)(b), § 707(b)(2)(A)(iii)(I) makes no provision for a debtor's anticipated changes in expenses. In short, expenses cannot both be determined in accordance with § 707(b)(2) and, and the same time, be determined based on a rule that is not in accordance with § 707(b)(2). Section 1325(b)(3) is not written to be a presumption that may be overcome with evidence of the debtor's state of affairs as of the confirmation date – its language is mandatory. Because § 1325(b)(3) is the more specific statute, its provisions take priority over the more general application of § 1325(b)(1). *E.g.*, *Edmond v. United States*, 520 U.S. 651, 657 (1997) ("[W]here a specific provision conflicts with a general one, the specific governs."); *In re Oliver*, No. 06-30076, 2006 Bankr. LEXIS 1607 at *7-8 (Bankr. D. Ore. June 29, 2006) (holding that § 1325(b)(3) is the more specific statute and, therefore, it prevails over any language used in § 1325(b) that might be

---

[5] 1325(b)(1)(B) provides that "the court may not approve the plan unless, as of the effective date of the plan . . . (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan."

18

construed to allow a court to look at future events).

Also, § 1325(b)(1)'s reference to the "effective date of the plan" must be taken in context of § 1325(b)(1)(B), which requires a debtor to be paying the trustee the debtor's "projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan . . . ." The first plan payment is due 30 days after the filing of the bankruptcy petition – which is sometimes treated as the effective date of the plan. § 1326(a)(1)(A); *In re Nice*, 355 B.R. 554, 563 n.7 (Bankr. N.D.W. Va. 2007) (noting that debtors in the district are generally allowed to chose the effective date of the plan for purposes of calculating the 3-5 year applicable commitment period as either the date of the first plan payment under § 1326(a)(1), or as of the confirmation date); Keith Lundin, *Chapter 13 Bankruptcy*, § 200.1 (3d ed. 2004) (noting that the length of a Chapter 13 plan may be calculated from the petition date, the date the first plan payment is due, the confirmation date, or at some other time). Determining a debtor's disposable income as of the petition date lets all parties know exactly how much the debtor's first plan payment will have to be to overcome a potential disposable income objection. Additionally, a debtor's projected disposable income is, by nature, based on a hypothetical set of circumstances. The projection is to be made – not from the effective date of the plan – but from the beginning of the applicable commitment period, which may be 30 days after the filing of the petition.

Moreover, as noted by the court in the case of *In re Burmeister*, 378 B.R. 227, 231 (Bankr. N.D. Ill. 2007), the phrase "as of the effective date of the plan" in § 1325(b)(1) modifies the phrase "the plan provides," not the term "disposable income;" thus, the "effective date of the plan" language only "dictates when the plan has to provide for payment of all the debtor's disposable income to unsecured creditor," not what the amount of the payment will be, which is a calculation to be "made as of the petition date."

    e.    **"Reasonably Necessary to be Expended"**

While § 1325(b)(2) states that the determination of a debtor's "disposable income" requires a calculation of the amount "reasonably necessary to be expended" for the maintenance and support of a debtor, § 1325(b)(3) provides the method for making that calculation. Because the expenses for an above the median income debtor are determined in accordance with § 707(b)(2), and because nothing in the language of § 1325(b)(2) supercedes that requirement, the language "reasonably necessary to be expended" does not provide a court with a mechanism to ignore the effects of § 707(b)(2) and use an

19

expense amount that the court feels is more apropos to the individual case. *E.g.*, *Turner*, 384 B.R. at 545 ("While a mechanical application of the means test may lead to unfair or anomalous results, the Court cannot conclude that those results contravene legislative intent such that it should essentially rewrite the statute by adopting a more flexible approach."); *contra In re Spurgeon*, 378 B.R. 197, 202 (Bankr. E.D. Tenn. 2007) ("The use of 'to be expended' generally requires the court to determine actual future expenses instead of being bound to assume that past expenses will continue.").

### f.  "First Become Payable After the Date of the Petition"

As stated by the court in the case of *In re Ross*, 382 B.R. 759, 763 (Bankr. W.D. Ark. 2008), a Chapter 13 debtor is not allowed to take a secured debt expense deduction for surrendered collateral because 11 U.S.C. § 1325(b)(2)(A)(i) requires that the chapter 13 means test "reflect payments that first become payable after the date the petition is filed."

The cited language of § 1325(b)(2)(A)(i), however, does not support this interpretation:

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended–

> (A)    (i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed . . . .

§ 1325(b)(2)(A)(i).

The last clause, "that first becomes payable after the date the petition is filed," modifies only a domestic support obligation.  The verb "becomes" is singular; if it was intended to modify "amounts reasonably necessary to be expended" then it would be plural.  *E.g.*, *Van Bodegom Smith*, 383 B.R. at 446 n.2 ("This court assumes that the last clause . . . modifies only 'a domestic support obligation' . . ."); 8 *Collier on Bankruptcy* ¶ 1325.08[5][c] (Alan N. Resnick & Henry J. Sommer, eds. 15th ed. rev. 2008) ("For all debtors, payments on domestic support obligations first payable after the petition is filed are, under new language in section 1325(b)(2)(A)(i), specifically deducted from income in determining disposable income.").

### g.    Purpose of the Means Test in Chapter 7 and in Chapter 13

It is axiomatic that Chapter 7 and Chapter 13 serve different purposes.  Chapter 7 entails a review

20

of the debtor's assets, and the liquidation of any non-exempt equity in those assets for the benefit of the debtor's pre-petition creditors. Chapter 13 allows a debtor to keep his or her assets, by making payments to the debtor's creditors over a period of three to five years. Some courts have determined that the different purposes of Chapters 7 and 13 of the Bankruptcy Code require a different interpretation of § 707(b)(2)(A)(iii)(I) in Chapter 13 cases. *E.g.*, *In re Vernon*, No. 07-5638, 2008 Bankr. LEXIS 928 at *11-12 (Banrk. M.D. Fla. March 5, 2008) ("[I]n construing a Chapter 13 plan, Congress intended to determine the maximum a debtor could pay . . . . As a result, the Debtor' arguments for allowing deductions even when collateral is surrendered post-petition may be appropriate within the context of a Chapter 7 case . . . but are inapplicable [to § 1325(b)] due to the different policy goals of Chapter 13.").

The means test is used in Chapter 7 as an indicator for whether the granting of relief under Chapter 7 would be an abuse. *In re Perfetto*, 361 B.R. 27, 29 (Bankr. D.R.I. 2007). Indeed, the purported aim of the means test in Chapter 7 is to force those debtors who can pay into a Chapter 13 repayment plan. *E.g.*, *In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D. Tex. 2006) ("The means test was intended to 'ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so.'") (citing 151 Cong. Rec. S2470 (March 10, 2005)). When the means test is used in connection with a Chapter 13 plan, however, its purpose is different. Namely, the means test functions to determine how much money an above the median income debtor must pay to unsecured creditors to have a plan that is capable of being confirmed over a disposable income objection. *Perfetto*, 361 B.R. at 29.

Importantly, however, § 1325(b)(3) does not alter the language, or the application, of § 707(b)(2). While some expense deductions in § 707(b)(2) will be different in Chapter 13, those changes are by statute,[6] and no statutory exception exists in Chapter 13 with regard to the application of § 707(b)(2)(A)(iii)(I) and the surrender of secured collateral. The court is to presume that Congress expresses its intent through the language it chooses, and the language of the statue will control unless there is a clearly expressed legislative intention contrary to that language. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 n.12 (1987).

---

[6] Section 1322(f) of the Bankruptcy Code specifically states that a debtor's expenditures to payoff a loan from the debtor's pension is not to be considered in the calculation of disposable income under § 1325(b).

The court has not located any clearly expressed legislative intention that secured debt expenses deducted from the means test in Chapter 7 should be different from secured debt expenses deducted from the disposable income test in Chapter 13. The court recognizes the reality in this case that the use of a mechanical means test formula does not comport with the Debtor's actual expenditures; however, Congress specifically chose to divorce a debtor's means test expenses from reality. *E.g.*, *Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31*, Pt. 1, p. 553, 109th Cong., 1st Sess. (2005) ("The bill also makes substantial changes to chapter 13 by substituting the IRS expense standards to calculate disposable income . . . . [T]he formula remains inflexible and divorced from the debtor's actual circumstances.") (dissenting views); *Turner*, 384 B.R. at 544-45 *("Congress deliberately and emphatically chose – after years of debate – a formulaic test over a more flexible, judicially governed standard . . . .").

Thus, while the goal of Congress was to ensure that debtors who can pay their debts do so, the mechanism to achieve that goal is the implementation of the means test in Chapter 13 cases for above the median income debtors. Elevating the former goal of the means test to maximize repayment to creditors in Chapter 13 cases over the latter goal of applying a formulaic, objective approach to determining disposable income "is not supported by the plain language of the statute or its overall context." *Randle*, 2007 U.S. Dist. LEXIS 54985 at *27.

In summary, this court holds that an above the median income Chapter 13 debtor is allowed to claim a secured debt expense for collateral that the debtor intends to surrender because: (1) nothing in an order of confirmation changes secured debts that are contractually due in the months following the petition; (2) § 1325(b)(3)'s mandate that expenses for an above the median income debtor "shall be determined in accordance with" § 707(b)(2)(A) is not discretionary; (3) the means testing expenses in § 707(b)(2)(A) are to be determined as of the petition date, and the statute is not forward looking in its Chapter 7 application; (4) an early determination of a debtor's disposable income is necessary to let the debtor know exactly how much the debtor's first payment under the plan must be, which must be made no later than 30 days after the filing of the bankruptcy petition; and (5) some of the expenses allowed a debtor on the means

22

test are purposefully artificial, and the test is not meant to be firmly grounded in reality.[7]

### 3.    Is the Result Reached by the Court in this Case Absurd?

Facially, allowing a debtor to claim a secured debt payment deduction on Form B22C for collateral that the debtor intends to surrender, and for which the debtor will no longer be making payments, seems strange. *See, e.g.*, Charles J. Tabb & Jillian McClelland, *Living with the Means Test*, 31 S. Ill. U. L. J. 463, 495 (2007) ("We recoil instinctively against the artificiality of ignoring what is really going to occur."). The result, however, is not unanticipated.

The expense deductions allowed by § 707(b)(2)(A)(iii), as imported into Chapter 13 by § 1325(b)(3), are a set of rules to be rigidly applied – they are not standards subject to judicial discretion and interpretation. *E.g.*, *Turner*, 384 B.R. at 542-44 (observing that a proposed amendment to adjust the means test to allow a judge the discretion to determine what expenses are reasonably and necessary was voted down in an effort to avoid the "vagaries of judgments in the courts and all that go with it.") (citing 145 Cong. Rec. H655-02 (May 5, 1999)); *Living with the Means Test*, 31 S. Ill. U. L. J. at 495-96 ("The idea was to create a simple, mechanical, easily administrable 'rough justice' test . . . . The clarity, predictability, and certainty (such as it is) of the means test would be greatly damaged by an open-ended

---

[7] *Accord*, *In re Turner*, 384 B.R. 537, 544-45 (Bankr. S.D. Ind. March 27, 2008) ("[T]he Court must conclude that the plain language of § 1325(b)(3) – even when read in conjunction with the rest of § 1325(b) – compels a mechanical application of the means test in determining the expense component of disposable income. Any other interpretation is simply too tortured to accept."); *In re Allen*, No. 07-41327, 2008 Bankr. LEXIS 364 (Bankr. D. Kan. Feb. 15, 2008) (overruling the Chapter 13 trustee's objection to confirmation and holding that "the means test is a snapshot in time, meant to assess a debtor's financial status as of the date the petition is filed."); *In re Anderson*, 383 B.R. 699 (Bankr. S.D. Ohio 2008) ("[T]he court finds no principled basis to interpret the statutory language differently for Chapter 13. . . . Congress may have wanted certainty of results . . . ."); *In re Burmeister*, 378 B.R. 227, 231 (Bankr. N.D. Ill. 2007) (stating that the answer to the question of why the debtors should be able to lower their disposable income by deducting mortgage payments that they will not make "is that Congress said so . . . ."); *In re Reis*, 377 B.R. 777, 783-84 (Bankr. D.N.H. 2007) (holding that the deduction was allowed in Chapter 7 and the results should not be any different in Chapter 13); *In re Oliver*, No. 06-30076, 2006 Bankr. LEXIS 1607 at *8 (Bankr. D. Ore. June 29, 2006) ("If Congress intended to limit secured debt payments contractually due from debtors on the petition date to those where actual future payments will be made in Form B22C calculations, it knew how to do so, as reflected, for example, by the inclusion of the terms "actual monthly expenses" and "actual expenses" elsewhere within section 707(b)(2)(A)(ii)(I) and (II).").

and ever-changing reassessment of what was really transpiring."); Rafael I. Pardo, *Eliminating the Judicial Function in Consumer Bankruptcy*, 81 Am. Bankr. L.J. 471, 472-73 (2007) ("The means test evinces a deep mistrust of the pre-BAPCPA discretion that had been exercised by the bankruptcy judiciary in its gatekeeper role under the substantial abuse dismissal regime . . . ."). Whenever rules are used in place of standards, some cases will be rounded. As explained by Professor Williams in analyzing an earlier version of BAPCPA:

> Rules and standards are tools for channeling the discretion of a decision-maker. [R]ules require a decision-maker to classify and label. Rules are perceived as outcome determinative. The entire conflict in litigation is to determine which rule controls. "Once the relevant right and mode of infringement have been described, the outcome follows, without any explicit judicial standards of the claimed right against the government's justification for the infringement." In contrast, standards require a decision-maker to weigh competing rights and interests. Standards are not perceived as outcome determinative, "but [the outcome] depends on the relative strength of a multitude of factors."
>
> . . . . The superior authority can attempt to limit the discretion of a decision-maker by fixing or requiring rules. Rules promote consistency, predictability, and judicial restraint in decision making. Rules are designed to confine a decision-maker to the role of sifting through the facts of a case, a task generally devoid of subjective value choices. Rules also provide fair notice of what is expected of parties in interest.
>
> In contrast, standards are generally perceived as indeterminate. They are contextual determinations that . . . embody the "pragmatic spirit of the common law judges." Standards allow and encourage wide-ranging discretion (legal, political, and otherwise) on the part of a decision-maker to decide concrete cases. Standards are arguably fairer than rules because they promote substantive justice and equality. Since a standard-like approach is not committed to a fixed protocol, the decision-maker is free to minimize the risk of error from the over- and under-inclusiveness endemic in a rule. Endowing a decision-maker with wide-ranging discretion, however, injects another type of error into the decision making process; namely, error from bias and incompetence. Additionally, standards may provide less notice of what is expected of parties in interest.

Jack F. Williams, *Distrust: The Rhetoric and Reality of Means-Testing*, 1 Am. Bankr. L. Rev. 105, 119-21 (1999).

In determining whether to stray from the result of the application of a statute, the Court in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) instructed that a court may deviate "in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the

24

intentions of its drafters.'" Out of deference of the supremacy of the legislature, and out of the recognition that members of Congress typically vote on the language of a bill, the Court has stated its "unwillingness to soften the import of Congress' chosen words even if [the Justices] believe the words lead to a harsh outcome . . . ." *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004). Thus, a court is not free to "'provide for what [it] might think is . . . the preferred result.'" *Id.* at 542 (citation omitted).

In this court's view, the legislative history concerning the issue in this case evidences a desire to apply a mechanical means test that imposes a rigid set of rules (not standards) aimed at curtailing judicial discretion. *See, e.g.*, Marianne B. Culhane and Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?* 13 Am. Bankr. Inst. L. Rev. 665, 678-80 (2005) ("'[A] standard, like [former] section 707(b), vests too much discretion in bankruptcy judges . . . .' What was needed instead was a clear rule, 'an algorithm purposefully designed to limit judicial discretion on the issue of consumer debtor abuse.' . . . Congress adopted rules, not discretionary standards, to govern ability to pay. Those rules are uniform and predictable, as Congress intended. They communicate to debtors and other parties in interest what is expected. Whether they are strict enough is a legislative decision.").

In sum, the court cannot say that the result in this case is absurd inasmuch as it is a natural consequence of the application of a rigid set of rules, specifically chosen to advance the application of objective criteria over a judicially based case by case determination. While the result reached in this case may "be puzzling or perhaps unsettling to creditors," the result reached by the court is "far from absurd*." In re Williams*, No. 06-32921, 2007 Bankr. LEXIS 2472 at *20 (Bankr. E.D. Va. July 19, 2007). A result may "be 'unreasonable' or even 'quite unreasonable' " and still not be "absurd." *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 268 (4th Cir. 2004).

**B.      Non-Debtor Party Payment of Secured Debt Obligation**

The Trustee objects that the 2004 truck in possession of the Debtor's ex-boyfriend is not necessary for the Debtor's Chapter 13 reorganization on the basis that the Debtor does not use the truck and she does not make the payments on it to the secured lender.

Of course, § 707(b)(2)(A)(iii)(I), as made applicable to the Debtor's Chapter 13 case by § 1325(b)(3), does not require that a debtor actually be making payments on secured debts. All it requires is that payments on secured debts be contractually due:

25

(iii)    The debtor's average monthly payments on account of secured debts shall be calculated as the sum of –

(I)    the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition;

. . .

divided by 60.

§ 707(b)(2)(A)(iii).

No dispute exists in this case that the Debtor is a co-obligor on the note and that payments on the secured debt are due post-petition. Thus, the Debtor's $307.83 monthly deduction for contractually due secured debt payments on the 2004 truck is proper under the language of the statute. The statute simply makes no distinction in this regard.

The court's conclusion that the deduction is proper, however, does not mean that the Debtor will receive the benefit of the full deduction on Form B22C. Importantly, the Debtor's ex-boyfriend is making the Debtor's contractual payments. The amount that the ex-boyfriend has paid over the six months preceding the bankruptcy filing should be factored into the Debtor's calculation of "current monthly income" on Part I of Form B22C. By not including the receipt of this benefit, the Debtor has understated her income. More specifically, the term "current monthly income" is defined in 11 U.S.C. § 101(10A) to include "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income derived during the six month period [preceding the filing of the petition]. . . ." The statute further states that "current monthly income" also "includes any amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor . . . ." § 101(10A)(B).

What constitutes a "household expense" is not defined in the Bankruptcy Code. In this court's view, however, if the Debtor takes a deduction from her current monthly income for a secured debt that she is contractually required to pay, but for which a non-debtor party is making the payments, then the Debtor must also include the amount of the third party payments in her calculation of current monthly income.

Consequently, the court will sustain the Trustee's objection to confirmation of the Debtor's proposed Chapter 13 plan to the extent that the Debtor is required to amend Form B22C to increase her

26

calculation of her current monthly income to account for the benefit received by the Debtor of having her ex-boyfriend make her contractually due secured debt payments.

## III. CONCLUSION

The court will deny the United States Trustee's objection to confirmation of the Debtor's proposed Chapter 13 plan, and will sustain in part and deny in part the Trustee's objection to confirmation.

A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.